## CIRCUIT COURT OF THE CITY OF NORFOLK

Brianna Speelman,
an infant,
by Cheryl Speelman,
and Cheryl Speelman
and Wayne Scott Speelman,
individually

v.

Gary M. Browning,
and Tidewater Physicians
for Women, Inc.,
A division of Mid-Atlantic
Women Care, P.L.C.

Case No. (Law) L99-75

BY JUDGE LYDIA CALVERT TAYLOR

December 21, 2001

The above-referenced medical malpractice suit for personal injuries was tried for six days to a jury before the undersigned in September of this year. After the jury returned a verdict for the plaintiff, the court sustained the defense's motion to reduce the verdict to $1 million, the statutory cap on damages in such a case. The case is now before the court for decision, after briefs and arguments from both sides, on a defense motion to set aside the verdict because of insufficient evidence. Specifically, defendant contends, the

plaintiff failed to present sufficient evidence to prove plaintiff was injured as a result of the defendant's negligence, and therefore the court should set aside the jury verdict and order a new trial.

*Facts*

The facts brought out at trial are summarized herein only insofar as they are relevant to the instant motion. As is required by the court on such a motion, all facts and inferences that can reasonably be drawn from those facts are taken in the light most favorable to the prevailing party, the plaintiff.

Brianna Speelman, an infant, was delivered vaginally by Dr. Browning, an obstetrician. After the labor had begun, but had become non-progressive, Dr. Browning administered pitocin to the mother. Initially, the pitocin stimulated her labor; however, between 11:45 a.m. and 2:45 p.m., labor stopped progressing.[1] Despite the arrest of labor, Dr. Browning determined not to perform a Caesarian section but rather to assist vaginal delivery with manual traction, which he completed with some difficulty. Shortly after her birth, Brianna was diagnosed with a shoulder dystocia.

The plaintiff called three medical experts, Dr. Stokes, Dr. Ravitz, and Dr. Adler, the first two of whom were obstetricians and testified as to the standard of care applicable to Dr. Browning's delivery of Brianna.

Dr. Stokes testified that Dr. Browning violated the standard of care in "at least six or seven substantial areas," including the failure to perform a Caesarian section. (Testimony of Dr. Stokes, 7:2.) He specified that failure to recommend that Ms. Speelman undergo a Caesarian section was a violation of the standard of care (*id.* at 12:18) and that the failure to perform a C-section resulted in injury to Brianna Speelman. (*Id.* at 7:2.) He added that Brianna suffered symptoms indicative of the use of excessive force in her delivery and that such symptoms were apparent immediately after Brianna's birth. (*Id.* at 28:16.)

Dr. Ravitz testified that, because of the slow progress of Brianna's delivery, the standard of care required delivery by Caesarian section. (Testimony of Dr. Ravitz at 15:12.) He said a Caesarian section is called for when delivery has been non-progressive for two or more hours and thus should have been performed in the instant case, where delivery was non-

[1] The progress of labor is typically measured by the dilation of the mother's cervix. In normal labor, the cervix will dilate at the rate of 1.5 centimeters per hour. From 11:45 a.m. to 2:45 p.m., the mother's dilation remained constant at 7 centimeters. (Testimony of Dr. Ravitz, 12:24.)

progressive for three full hours. (*Id.* at 13:2, 14:4.) Because pitocin had already been administered for over three hours, yet had failed to stimulate proper labor, his opinion was that other intervention was required. (*Id.* at 21:8.) If a Caesarian section had been performed, Brianna would not have suffered a shoulder dystocia, according to Dr. Ravitz. (*Id.* at 40:6, 41:23.) Finally, Dr. Ravitz testified that it was not the maneuvers that Dr. Browning performed in manually delivering Brianna that breached the standard of care; rather, Dr. Browning's breach of care lay in not avoiding a manual delivery altogether by performing a Caesarian section. (*Id.* at 57:9.)

Dr. Adler qualified as an expert in pediatric neurology and brachial plexus injury, but not in obstetrics. (Testimony of Dr. Adler, 8:2, 17:21.) Thus, he did not offer opinions on the applicable standard of care, but limited his testimony to an analysis of the causation of Brianna's injuries. He testified that Brianna had suffered injuries to the first four nerves of her brachial plexus (*id.* at 13:8), which injury occurred when those nerves were stretched with tremendous force (*id.* at 17:1), at some time between the time when Brianna's head emerged and the point when the delivery was completed. (*Id.* at 19:10.) Brianna's injuries were unlikely to have occurred *in utero*, because, with such uterine injuries, muscular atrophy is evident at birth, which was not the case with Brianna. (*Id.* at 21:2.)

## Discussion

### 1. *Standard of Review*

The defendant's motion asks the judge to decide, in essence, that the jury acted unreasonably and to set aside its verdict. That jury verdict is entitled to respect unless it deviates from certain norms.

The right to trial by jury is of ancient vintage and its vitality has not waned. The Virginia Constitution dictates that "in controversies respecting property, and in suits between man and man, trial by jury is preferable to any other, and ought to be held sacred." Va. Const., Art. I, § 11. Preservation of this ancient right demands that courts treat jury verdicts with deference and set aside jury verdicts only when reasonable men could not decide as the jury did. Under Code § 8.01-430, a trial court may set aside the verdict of a jury in a civil action only when the verdict is contrary to the evidence or is without evidence to support it. The trial court's authority to do so is limited by the following principles:

> If there is a conflict in the testimony on a material point, or if reasonable [persons] may differ in their conclusions of fact to be

drawn from the evidence, or if the conclusion is dependent on the weight to be given the testimony, the trial judge cannot substitute his conclusion for that of the jury merely because he would have voted for a different verdict if he had been on the jury. The weight of a jury's verdict, when there is credible evidence upon which it can be based, is not overborne by the trial judge's disapproval.

*Lane v. Scott*, 220 Va. 578, 581-82 (1979) (quoting *Commonwealth v. McNeely*, 204 Va. 218, 222 (1963)). *Accord Henderson v. Gay*, 245 Va. 478, 480-81 (1993).

On a motion to strike, a court must sustain a jury verdict if there is any credible evidence to support it and the evidence must be viewed in the light most favorable to the party for which the jury ruled. *Sloan v. Thornton*, 249 Va. 492 (1995) (*citing Board of Supervisors v. Lake Services, Inc.*, 247 Va. 293, 294 (1994)); *Holland v. Shively*, 243 Va. 308, 309 (1992). Thus, the dispositive question is whether, viewing the evidence in the light most favorable to the plaintiff, the plaintiff has established the elements of a claim for medical malpractice.

## 2. *Expert Evidence*

To prevail in an action for medical malpractice, the plaintiff must (1) establish the standard of care, (2) demonstrate that the defendant's actions breached the standard of care and (3) prove that the defendant's breach was the proximate cause of the plaintiff's injuries.[2] Each of these elements must be established by expert testimony. *Raines v. Lutz*, 231 Va. 110 (1986); *Bly v. Rhoads*, 216 Va. 645, 653 (1976). The issue, then, is whether, viewed in the light most favorable to the plaintiff, the expert evidence in the instant case is sufficient to establish each of those three required elements.

Doctor Ravitz qualified as an expert in obstetrics and gynecology. He clearly and unambiguously testified that the standard of care required the defendant to perform a Caesarian section when delivery failed to progress at a normal rate and that the defendant therefore breached that standard.

---

[2] A proximate cause of an event is that "act or omission which, in natural and continuous sequence, unbroken by an efficient intervening cause, produces the event, and without which that event would not have occurred." *Sugarland Run Homeowners Ass'n v. Halfmann*, 260 Va. 366, 372 (2000) (*quoting Beale v. Jones*, 210 Va. 519, 522 (1970)). Generally, the question of proximate cause is an issue of fact to be resolved by a jury. *Jenkins v. Payne*, 251 Va. 122, 128 (1996).

(Testimony of Dr. Ravitz, 15:12.) As to causation, Dr. Ravitz testified that Brianna would not have suffered a shoulder dystocia had Dr. Browning conformed to the standard of care and delivered Brianna via Caesarian section. (*Id.* at 40:6.) Since it is for the jury to weigh the credibility of testimony and Dr. Ravitz's testimony is neither so illogical nor so unreasonable that the jury must reject it, this court must accept Dr. Ravitz's testimony as true for the purposes of the defendant's motion to strike.

Dr. Ravitz's testimony alone is more than sufficient to support the plaintiff's medical malpractice claim: (1) The standard of care required delivery by Caesarian section when labor remained non-progressive for over three hours. (2) Dr. Browning breached the standard of care by failing to perform a Caesarian section delivery. (3) Had Dr. Browning performed a Caesarian section, Brianna Speelman would not have been injured. Thus, accepting Dr. Ravitz's testimony, Dr. Browning's violation of the standard of care was not only a cause in fact of the plaintiff's injury, but its proximate cause. Muscular and nervous damage are natural and foreseeable consequences of the muscular contractions and maneuvers involving heavy traction required to vaginally deliver a child when labor is non-progressive due to the infant's position in the birth canal. Such contractions and heavy traction are not required to deliver by Caesarian section. Thus under Dr. Ravitz's view, Dr. Browning's violation of the standard of care was the proximate cause of the injuries that resulted to Brianna during the vaginal delivery.

The defendant argues that his negligence could not have proximately caused Brianna's injuries because the defendant never applied excessive traction in her delivery. In fact, plaintiff's expert, Dr. Stokes, cited Dr. Browning for doing exactly that, using excessive traction. The defendant argues that no one testified that "excessive traction" was a breach of the standard of care. In essence, the defendant argues that he did not breach the standard of care because the manual delivery was skillfully performed, which is contradicted by Dr. Stokes, as pointed out above.

Dr. Stokes testified that the defendant applied excessive force in the delivery. (Testimony of Dr. Stokes, 28:16.) Also, Dr. Adler opined that the injury occurred between the time the head emerged and the time the delivery was completed. This evidence seems to belie the defendant's assertion that no one cited any negligence by the defendant in his manner of delivery and thus the jury had to find that the traction Dr. Browning applied was not excessive. The jury had sufficient evidence to conclude that the manual delivery caused the injury, that is, that Dr. Browning negligently performed the manual delivery, and such actions caused the infant's injuries, that is, that the *manner* of the manual delivery was negligent. However, the jury also had evidence

from which it could conclude that, even if the manner in which the manual delivery was performed met the standard of care, the *fact* that a manual delivery was performed at all, rather than the appropriate delivery method, a Caesarian section, was itself a deviation from the standard of care and that the decision by Dr. Browning caused and made inevitable the injury during the manual delivery. Delivery by Caesarian section would have averted the need for the baby to have suffered through a forceful manual delivery, during which delivery the baby was foreseeably injured. Dr. Adler's testimony was that, during the prolonged labor and manual delivery, Brianna's nerves and muscles were subjected to tremendous stress. Dr. Stokes testified that symptoms evidencing great force were apparent immediately after the delivery.

However, even assuming *arguendo* that the defendant properly performed the manual vaginal delivery, a jury question would still exist as to whether Dr. Brown's failure to perform a Caesarian section, which would have obviated the need for manual delivery, during which the plaintiff was foreseeably injured, constituted medical malpractice. Dr. Ravitz, one of the plaintiff's experts, locates the defendant's violation of the standard of care not in the manner that the manual delivery was performed, that is, not the defendant's choice of maneuvers to use during the vaginal delivery nor his manner of performing the various maneuvers, but rather in the decision to perform a manual delivery at all. He opined that the standard of care required that a Caesarian section be performed, precisely because of the trauma involved in vaginal delivery when labor is not progressing as it should. Therefore, under Dr. Ravitz's view, whether the defendant applied excessive traction while manually delivering Brianna is simply irrelevant to whether his failure to perform a Caesarian section, thereby necessitating a difficult manual delivery, violated the standard of care under the circumstances and caused the plaintiff's injuries by subjecting her to the unnecessary trauma of a prolonged vaginal delivery. A defendant is liable not only for his acts, how Dr. Browning performed the manual delivery, but for his omissions, here, the failure to perform a Caesarian section to avoid the trauma of a manual delivery after a prolonged non-progressive labor.

The defendant also argues that "Dr. Stokes could not state with medical certainty or probability that a specific deviation caused the child's injury. Rather, he lumped both of his possible theories together to state that one of the two caused the injury." (Defendant's brief at 4.) Defendant cites, for example, a case in which an expert "can't say" which procedure caused an injury. *Bryan v. Bart*, 254 Va. 28 (1997). However, Dr. Stokes does state what were the breaches, any one of which alone could have caused the injury. Additionally, during Dr. Stokes's testimony, the defendant did not present a

clear objection to that use of alternative causation theories, and thus they came without objection to the alternative nature of Dr. Stokes's conclusions. Moreover, because it is for the jury to weigh the credibility of conflicting expert testimony, the defendant's motion to strike can succeed only if *no* expert testimony supports a *prima facie* case of medical malpractice. Even if Dr. Stokes had explicitly testified that no malpractice occurred — which was clearly not his testimony — reasonable jurors still could have chosen to believe Dr. Ravitz's testimony, which as explained above, supports the jury finding that each element of medical malpractice was proven. Thus, given Dr. Ravitz's testimony, it is unnecessary for this court to decide the question of whether Dr. Stokes's testimony alone would support a claim for malpractice in order to uphold the jury's verdict. Dr. Stokes's testimony cannot be considered in isolation, but rather as only part of what the jury had before it.

### 3. *Injury Itself as Insufficient Proof of Breach*

Lastly, the defendant argues that the testimony of excessive traction itself is insufficient as a matter of law to establish a violation of the standard of care because injury alone is insufficient to establish negligence. (Defendant's brief at 5.) The court agrees with that statement; *res ipsa loquitur* does not apply to medical malpractice cases. In other words, defendant is correct that the fact of an injury alone does not prove that there was a breach, nor that the breach, excessive traction, caused the injury. Defendant is of the opinion that, in this case, there was no evidence other than the injury itself to establish the presence of a breach by use of excessive traction. That argument represents an incorrect reading of the evidence. As set forth above, there is expert testimony that Dr. Browning used excessive traction and that such traction violated the standard of care and caused the infant's injuries. As used by the plaintiff's experts to describe the defendant's conduct, "excessive traction" means an amount of traction or force that is more than should be used under the circumstances, a deviation from the standard amount of force that should have been applied by an obstetrician in a delivery. The context of the expert testimony using that term (see *supra*), the *Black's Law Dictionary* definition of "excessive,"[3] and the facts of this case[4] all bolster that view of the testimony of the defendant's experts.

---

[3] *Black's Law Dictionary* (4th ed., rev. 1968) at 670 (citations omitted) defines excessive as: "Greater than what is usual or proper; overmuch; a general term for what goes beyond just measure or amount. ... Tending to or marked by excess,

However, even if defendant is correct in that argument, the plaintiff's verdict should be upheld because of Dr. Ravitz's testimony that the defendant breached the standard of care, not by applying excessive traction, but by failing to perform a Caesarian delivery, creating a situation in which injury to the infant plaintiff occurred during the contra-indicated manual delivery, whether performed negligently or not. Either omission or commission, the omission of a Caesarian section, without which the trauma of a manual delivery would not have taken place, or the commission of the use of excessive traction during that delivery, constitutes a breach that the jury could have found caused the infant's injury.

## Conclusion

The court overrules the defendant's motion to strike the plaintiff's expert evidence, declines to find that, as a matter of law, the jury could not have found for the plaintiff, and refuses to order a new trial. The expert testimony presented by the plaintiff supports the jury's conclusion that the defendant committed malpractice that proximately caused the plaintiff's injuries.

## February 11, 2002

This letter sets forth a summary of the oral opinion I rendered at a hearing on January 31 on the right of the plaintiff to recover legal interest from the date of the jury's verdict in the above referenced matter. Specifically, the written and oral arguments presented the question of whether the medical malpractice recovery cap applies to bar interest accruing between the jury verdict for the plaintiff and the court's entry of final judgment pursuant to such a verdict, interest that I have termed at times "verdict to judgment" interest. Resolution of this question requires the Court to delve into the interplay between Code § 8.01-382, which governs the award of interest generally, and Code § 8.01-581.15, which caps the plaintiff's recovery in

---

which is the quality or state of exceeding the proper or reasonable limit or measure. ..."

[4] Among other things, Dr. Browning, who probably weighed well over 300 pounds, was seen by the jury when he took the stand and demonstrated his actions during the delivery to them. Among other things, he showed them how he sat on a stool and, because he needed to apply more force in the more difficult maneuvers of the baby at the last moments of manual delivery, stood up, kicked the stool away, and proceeded to maneuver the baby out of the birth canal.

medical malpractice cases, to see if these two provisions can be harmonized. The pertinent part of the former section provides:

> If a judgment or decree be rendered which does not provide for interest, the judgment or decree awarded shall bear interest from the date of entry ... provided, if the judgment entered in accordance with the verdict of a jury does not provide for interest, interest shall commence on the date when the verdict was rendered.

Code § 8.01-382. The latter provision, Code § 8.01-581.15, provides, in pertinent part, "In any action against a healthcare provider for malpractice ... the total amount recoverable for any injury to, or death of, a patient shall not exceed [the statutory cap]." *Id.* The parties agree that the statutory cap in effect for this case was $1,000,000.

When statutory language is clear and unambiguous, there is no need for construction by the court; the enactment will be given its plain meaning. *HCA Health Services v. Levin*, 260 Va. 215, 220 (2000) (*citing Brown v. Lukhard*, 229 Va. 316, 321 (1985)). Courts must give effect to legislative intent, which must be gathered from the words used, unless a literal construction would involve a manifest absurdity. *Levin* at 215 (*citing Abbott v. Willey*, 253 Va. 88, 91 (1997)). A court must examine all parts of a statute and, if possible, make them harmonious. *McDaniel v. Commonwealth*, 199 Va. 287, 292 (1957). The same is true for two separate statutes. Thus, in the case at bar, the Court must attempt to interpret the two sections, Code §§ 8.01-382 and 8.01-581.15, in a manner that harmonizes them without departing from the plain meaning of either. Such a construction is possible.

By its plain language, Code § 8.01-581.15 limits only the plaintiff's recovery for his injuries and/or death; it does not vitiate any of the plaintiff's other legal rights.

The court's determination that Code § 8.01-581.15 should not be applied beyond its literal meaning is also compelled by another familiar principle of statutory construction. "Statutes in derogation of common law are to be strictly construed and not to be enlarged in their operation beyond their express terms." *Schwartz v. Brownlee*, 253 Va. 166 (1997) (*quoting Blake Const. Co. v. Alley*, 233 Va. 31, 34 (1987), and *Barnes v. Ashworth*, 154 Va. 318, 229 (1930)). Following this principle, the Virginia Supreme Court has repeatedly refused to extend § 8.01-581.15 beyond the literal meaning of its language, in determining who is a "health care provider" and therefore entitled to the protection of the statutory cap on recovery. *See e.g., Taylor v. Mobil Corp.*, 248 Va. 101 (1994) (physician who had allowed his license to lapse not entitled to the protection of the statutory cap because he was not a

"health care provider" within the meaning of the statute); *Schwartz v. Brownlee*, 253 Va. 159 (1997) (corporation that employed a physician was not entitled to the protection of the statutory cap because it was not a "health care provider" within the meaning of the statute).

If the right to interest between a jury verdict and judgment is distinct from the right to recover *for* injuries caused by medical malpractice, the Court can delve below the superficially antagonistic tendencies of Code §§ 8.01-382 and 8.01-581.15 to give meaning to each. Under such a construction, Code § 8.01-382 confers on plaintiffs a right to interest between the jury verdict and judgment, while Code § 8.01-581.15 limits the total amount of a plaintiff's recovery for his or her injuries. However, Code § 8.01-581.15 does not prejudice a plaintiff's separate and distinct right to recover interest after damages are liquidated,[5] that is, after the verdict but before judgment. Thus, the dispositive question in the case at bar is whether the statutory right to recover "verdict to judgment interest" under Code § 8.01-382 is distinct from the right to recover *for* injuries caused by medical malpractice, including interest to compensate the plaintiff for the delay in the determination of the amount of damages at trial.

The Supreme Court has drawn a distinction between prejudgment and postjudgment interest which, while not directly applicable to the instant case, supplies the legal principles necessary to resolve it. It is black letter law that "[p]rejudgment interest is normally designed to make the plaintiff whole and is part of the actual damages sought to be recovered." *Pulliam v. Coastal Emergency Services*, 257 Va. 1, 25 (1999) (*quoting Dairyland Ins. Co. v. Douthat*, 248 Va. 627, 632 (1994), and *Monessen Southwestern Ry. v. Morgan*, 486 U.S. 330, 335 (1988)). Conversely, "Postjudgment interest is not an element of damages, but is a statutory award for delay in the payment of money actually due." *Dairyland* at 632.

In *Nationwide Mut. Ins. Co. v. Finley*, 215 Va. 700 (1975), the plaintiff sued his insurer under the Uninsured Motorist ("UM") provision of his automobile insurance policy. The policy limited Nationwide's UM liability to $20,000, the minimum quantum of UM coverage permitted by Code § 38.1-381(b). After a jury awarded $25,000 to the plaintiff, Nationwide paid the plaintiff $20,000. Both parties agreed that Nationwide was not liable for the $5,000 that the jury had awarded in excess of the policy limit. However, the plaintiff argued that Nationwide was responsible for post-judgment

---

[5] Under Virginia case law, recovery *for* a plaintiff's injuries includes interest accruing between the time of injury and the time damages are liquidated. *Dairyland*, 248 Va. at 632.

interest even though such interest would bring his total recovery above the policy limit. The Supreme Court held that Nationwide was liable for postjudgment interest, even though such interest made the total recovery exceed the policy limit, reasoning that "[i]nterest liability, an obligation imposed by one statute, is separate and distinct from the *contract* liability imposed by another statute." *Id.* at 702 (emphasis in original).

This principle would seem to be dispositive of the instant case. Like post-judgment interest, liability for "verdict to judgment" interest is imposed by a statute. Indeed, both "post-judgment" interest and verdict to judgment interest (although not denominated by such name) are imposed by the *same* statute, Code § 8.01-382. Thus, interest mandated by the statute to be paid for the interim between the verdict and judgment is not part of the plaintiff's recovery *for* her injuries, but a "separate and distinct" statutory liability analogous to postjudgment interest in both statutory source and purpose. Because Code § 8.01-581.15 limits only the plaintiff's recovery *for* her injuries, it does bar the plaintiff's recovery of "verdict to judgment" interest. Such interest, from verdict to judgment, is not an element of the recovery for the plaintiff's injuries, but statutory compensation for the delay in paying an amount once it is liquidated, or made certain, by a jury verdict.

The defendant's contention that *Advanced Marine Resources v. PRC, Inc.,* 256 Va. 106 (1998), acts to bar the award of "verdict to judgment" interest in this case is without merit. In *Advanced Marine Resources,* the chancellor did not enter a final order until approximately a year after his initial ruling from the bench in a suit for injunctive relief and for damages under Code §§ 18.2-499 and 18.2-500. *Id.* at 126. The chancellor[6] awarded interest from the date of his bench ruling, June 19, 1996, to the date of his entry of the final decree on June 18, 1997. The Virginia Supreme Court, however, held that the chancellor erred in awarding such interest "because some of the damages still were unliquidated" on the date of the chancellor's oral ruling. Thus, the chancellor should not have awarded interest until he finally determined the amount of the award, making it a definite, liquidated amount. *Id.* In essence, because the chancellor had not reached a final decision as to the damages on the date of his bench ruling, there was no liquidated amount on which the defendant could be charged interest. The Supreme Court pointed out that "several matters remained to be resolved" at the time of the chancellor's oral ruling from the bench.[7] *Id.* at 126-27. "Thus,

---

[6]   Although legal damages were awarded, the court was sitting in equity.

[7]   The parties had not yet argued, and the chancellor had not yet ruled, on several issues: (1) whether treble damages under § 18.2-500 were subject to the statutory

as of the date of the bench ruling, the amount of AME's liability remained unliquidated as to all amounts except the original compensatory damage award. ..." *Id.* The Supreme Court further pointed out that those issues were not resolved until the date of entry of the final decree and that the chancellor "candidly acknowledged that he was the cause of the one-year delay." *Id.* Therefore, while affirming all other parts of the chancellor's decree except a portion of costs awarded, they reversed the award of the prejudgment interest.

Conversely, in the case at bar, the trier of fact — here, the jury — reached a final decision as to a liquidated amount on the date the verdict was rendered, at which time the court reduced the amount awarded to the statutory cap and stated its intent to accept the verdict. The entry of the final decree was delayed only because of the defendant's desire to re-argue points on the issue of causation, issues which the court pointed out had been raised and argued during the trial. However, the defendant nevertheless asked for time to brief and reargue these issues to the court. The court allowed these issues to be briefed and reargued, not because it believed there was error in its judgment, but in order to give the defendant every benefit of the doubt in a case of this importance. Thus, in contrast to *Advanced Marine*, the delay was caused by the defendant's motion — not the court's delay in ruling — and the verdict that the jury awarded, as reduced by this court that same day so as to conform to the statutory cap, was a liquidated amount. Additionally, because *Advanced Marine* did not involve a jury verdict, the payment of interest in that case was not *mandated* by statute, but rather merely permissive. Thus, in all material respects, *Advanced Marine* is distinguishable from the instant case.

Under the scheme of Code § 8.01-382, the award of interest at the legal rate from the date of the verdict to the date of the judgment is not "prejudgment interest," as that term is used in its ordinary sense, to connote interest provided on an award to run from the date of injury, or a subsequent date, which is left to the discretion of the trier of fact when setting the amount of damages. In contrast, interest between jury verdict and judgment is statutorily mandated to accrue at the legal rate from the time the verdict or judgment is rendered until the judgment is paid in full.

In *Advanced Marine Enterprises, supra,* the trier of fact was the chancellor; in the instant case, the trier of fact was the jury. Because the chancellor in *Advanced Marine Enterprises* had not yet reached a final

---

cap of § 8.01-38.1; (2) whether the punitive damages should be reduced under that latter code section; and (3) what should be the amount of attorney's fees or costs to be awarded to the plaintiff. *Id.* at 127.

decision on damages, that case was not covered by § 8.01-382's statutory mandate that interest accrue at the legal rate from the date of the award. However, in the instant case, § 8.01-382 *requires* that interest accrue at the statutory rate from the date the jury verdict is rendered, unless the jury verdict is already accruing interest because of the jury's decision to award *prejudgment* interest.[8] In sum, if a jury verdict awards prejudgment interest, that interest continues accruing post judgment as well, but if the jury did not provide for interest, then the court must provide for interest beginning from the date the verdict is rendered.

For all the reasons set forth orally at the hearing and in this opinion, the Court awards interest at the legal rate on the reduced jury award for the interval between the jury verdict and the court's entry of judgment on that verdict.

---

[8] The defendant argued that this case does not conform to the statute in that the jury in fact awarded interest, albeit at a rate of zero percent, rather than "not provid[ing] for interest." Code § 8.01-382. In the court's opinion, this is a misreading of the statute. The statute first provides that any "judgment or decree" that does not provide for interest bears interest from the date of *its entry* at the legal rate. However, if a judgment entered "in accordance with the verdict of a jury" does not provide for interest, interest runs from the day the jury rendered its verdict. *Id.* The statute directs what shall be done when a *judgment* is silent as to interest; it is not concerned with what the jury verdict itself provided.

However, even if the statute read as the defendant would have the court believe, the defendant's argument would allow an absurd result. A jury that is presented with the alternative of providing or not providing interest and writes zero next to the percent sign is surely rendering a verdict — if that verdict, rather than the court's judgment order, were the touchstone of the statute — that "does not provide for interest." A jury that fills in a *zero* under the interest rate is denying a plaintiff interest just as clearly as a jury that writes out "no interest provided." Nevertheless, it is the court's belief that the statute simply requires that *postjudgment* interest be paid when a court neglects to provide it in the order, and that interest will accrue from the entry of the court's judgment, unless the judgment is entered on a jury verdict, in which case interest accrues from the date the jury renders its decision. Like a judgment, a jury verdict liquidates and thereby makes certain the quantum of damages.